## Estelle L. Mattice, Appellee, v. Nathan N. Klawans, Appellant.

### Gen. No. 27,175.

1. HIGHWAYS AND STREETS—*sufficiency of evidence of injury from negligent use of streets.* A judgment for plaintiff for injuries alleged to have been sustained by being crushed against a street car by defendant's automobile will not be disturbed although the evidence as to the accident consists solely of the testimony of the plaintiff and the occurrence is denied by the defendant and his son, who is alleged to have been driver of the car at the time of the accident, where the evidence tends to show that plaintiff received an injury through violence at the time alleged and that she then complained of having been struck by an automobile and where her testimony is not denied and is positive as to the occurrence of the accident, the negligence of defendant, identification of defendant and the automobile, ownership of which was proven, although there are discrepancies and contradictions in her testimony.

2. HIGHWAYS AND STREETS—*proof of identity of defendant as negligent user of street.* A judgment against defendant for damages from injuries sustained by plaintiff in an automobile collision is sufficiently sustained on the question of the identity of the automobile causing the injury where plaintiff testified that at the time of the accident she wrote down the license number of the car which struck her and asked the driver, a young man, for his name, which was refused, and where it appears that defendant was the owner of the car in question, that it was his daily practice to cross the street intersection where the accident occurred, at about the time thereof, and that his son, a young man of the age described by plaintiff customarily drove the machine for him and where plaintiff subsequently recognized defendant as an occupant of the car at the time of the accident, notwithstanding defendant and his son denied the whole occurrence.

3. HIGHWAYS AND STREETS—*negligence in alighting from street car.* Plaintiff, who was struck by defendant's automobile as she was alighting from a street car, is shown to have been exercising ordinary care by evidence that she was alighting with her face towards the front of the car and her hand on the handlebar thereof when struck, where defendant is charged with negligence in having driven his car too close to the street car in violation of a city ordinance and there is no evidence of any circumstance which would have required plaintiff to look to the rear.

4. HIGHWAYS AND STREETS—*driving automobile too close to*

Mattice v. Klawans, 228 Ill. App. 126.

*standing street car as negligence.* It is negligence to drive an automobile closer to a standing street car from which passengers are alighting than the distance permitted by a city ordinance regardless of the speed at which the automobile is operated.

5.   NEGLIGENCE—*admissibility of medical testimony based on objective symptoms.* In an action for damages sustained by plaintiff when struck by defendant's automobile, it is not error to permit physicians who examined plaintiff three years after the accident to testify as to the condition in which they then found plaintiff and that such condition resulted from violence where the testimony was the result of an examination made for the purpose of testifying and was based substantially on objective symptoms.

6.   HARMLESS AND PREJUDICIAL ERROR—*admission of evidence afterwards stricken out as grounds for reversal.* It is not ground for reversal of a judgment for damages for personal injuries sustained by plaintiff when struck by defendant's automobile that plaintiff was permitted to testify that a physician told her she must rest and wear a specially constructed belt on account of a hip fracture, where a motion to strike such evidence was made and thereafter allowed and the jury were then instructed to disregard such testimony.

7.   HIGHWAYS AND STREETS—*instruction as to negligence in operating automobile too close to standing street car.* In a personal injury action resulting from the striking of plaintiff by defendant's automobile as she was alighting from a standing street car, an instruction which recites certain necessary elements to be found as a basis for recovery, including violation of an ordinance prohibiting driving an automobile within 10 feet of a standing street car, is not erroneous as directing the jury to find for plaintiff if they find that violation of the ordinance proximately caused the injury, where it requires that the jury must further find from a preponderance of the evidence that plaintiff is "otherwise entitled to recover," and especially where plaintiff made a *prima facie* case of negligence in driving too close to the car which was not denied.

8.   HIGHWAYS AND STREETS—*what constitutes ordinary care in alighting from standing street car.* An instruction that ordinary care "is that degree of care and caution which a reasonably prudent and cautious person would have exercised under the same or like circumstances, and in the situation in which plaintiff was placed, as shown by the evidence," is not erroneous where the evidence shows that plaintiff was alighting from a standing street car from which other passengers had alighted, that she had one foot on the ground and was holding the handlebar with her hand and was about to step to the ground when defendant's automobile came from the rear without warning and crushed her against the car.

9.   DAMAGES—*excessiveness of verdict for personal injuries.* In

a personal injuries action a verdict for $5,000 for injuries sustained by plaintiff from being struck by defendant's automobile as she was alighting from a street car is not excessive where there is medical testimony which tends to show that plaintiff sustained fractures of the hip and ribs and other injuries which disabled her for a considerable period of time and permanently impaired her health, although there is other medical evidence that such conditions were the result of disease and not accident.

THOMSON, P. J., dissenting.

Appeal by defendant from the Circuit Court of Cook county; the Hon. HARRY B. MILLER, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1921. Affirmed. Opinion filed February 16, 1923. Rehearing denied March 1, 1923. *Certiorari* denied by Supreme Court (making opinion final).

McCORMICK, KIRKLAND, PATTERSON & FLEMING, for appellant; CHARLES F. RATHBUN, of counsel.

A. H. RANES and C. L. RICE, for appellee.

MR. JUSTICE TAYLOR delivered the opinion of the court.

The plaintiff, Estelle L. Mattice, claiming to have been injured by an automobile owned by the defendant, Nathan N. Klawans, crushing her against a street car, brought suit and obtained a judgment for $5,000. This appeal is therefrom. Suit was instituted on January 8, 1918. The declaration, consisting of two counts, set up: (1) that on October 8, 1917, the defendant, possessed of and driving an automobile at the intersection of Broadway and Roscoe street, in Chicago, managed it so negligently that, while the plaintiff was in the exercise of ordinary care, it ran into and seriously injured her; and (2) that while the plaintiff was alighting from a street car at the street intersection, and in the exercise of ordinary care, and the car was standing still and passengers were being discharged, the defendant, in violation of his duty and section 2728 F of the city ordinance, which re-

quired him not to pass or approach with his automobile within ten feet of the street car while it was stopped or standing to discharge or take on passengers, negligently drove the automobile within one foot of the street car, where the plaintiff was alighting, and, in consequence, collided with and injured her.

The defendant pleaded the general issue and nonownership and noncontrol.

At the trial, which was before a jury, the only witness who testified to the circumstances out of which it is claimed the cause of action arose was the plaintiff herself. Her evidence is to the following effect: That on the evening of October 8, 1917, at which time she was fifty-eight years of age and weighing about 180 pounds, she boarded a street car on Broadway, a north and south street, to go to Roscoe street, an east and west street; that the street car stopped on the south side of Roscoe street at the intersection with Broadway; that when it stopped and she was getting off, and while she had hold of the street car with her left hand and was facing north, an automobile belonging to the defendant collided with her right side and hip; that the automobile then backed up and let her loose from the street car; that after the automobile backed, she asked the man at the wheel his name; that at that time there were two men in the automobile; that she took a book out of her pocket and took down the number of the automobile, which was 207771; that she learned afterwards, in July 1920, that the defendant, Nathan N. Klawans, owned that automobile; that she saw him afterwards—having looked up his residence in the telephone book, and gone out to his house on Geary street—and recognized him as the man who was in the automobile the evening she was injured; that immediately after the collision she went home; that she did not have much pain until she got home and undertook to go upstairs; that she then felt pain in her side and hip; that she went to bed and

went to sleep and when she woke up she was in great pain; that the pain was in her side, hip, shoulder and the first finger of her left hand; that the evening of the day after the injury she sent for Dr. Ranes, a female doctor, the wife of her attorney, and on the second day after the injury one Dr. Loeser attended and examined her; that she was then taken to the American Hospital, Dr. Ranes accompanying her.

She was visited by Dr. Loeser after she got to the hospital; they rubbed her shoulder, hip and back with liniment, and bandaged her around the hips and ribs. She remained at the hospital from October 9 or 10 until November 2, 1917. Dr. Loeser called upon her at the hospital every day. A special cloth belt was made for her which she wore from November 1 until the last of March, 1918; it went entirely around her body and over her hip and down the back. When she left the hospital she used two crutches and was taken in a taxi to Mrs. Kloess' home on Lawrence avenue. Before the accident she weighed 182 pounds and the next Spring 147 pounds, and at the time of the trial 145 pounds. Subsequently she left the Kloess place on Lawrence avenue, being carried down from the third floor to a taxi and taken from the taxi to a train in a wheel chair, and went to Hartford, Connecticut to her daughter's home. When she arrived at Hartford, she was taken from the train in a wheel chair to an automobile and then driven to her daughter's home and carried up to the third floor and put to bed. She had pain nearly all the time in her hips and side and shoulder. She stayed at her daughter's from about November 5 or 6, 1917, until March, 1918. Sometimes she went out driving in her daughter's car. Two attendants from a sanitarium would come and carry her down to the car and then again back to her room.

From her daughter's she went to her brother's at Binghamton, New York. At that time she moved about on crutches. She stayed at her brother's until

the last of May, 1918.   While she was at her daugh-
ter's home and also while she was at her brother's,
physicians attended her.   She left her brother's in
May, 1918, and went to her sister's in Rochester, New
York.   At her sister's she used crutches most of the
time.   She was there for about four weeks and then
went to Detroit, Michigan, where she stayed with her
husband's nephew until her daughter came to Detroit
in the fall or winter of 1918.   She then went to her
home and stayed there until April, 1920, and then came
to Chicago, and went to Mrs. Kloess'.   Since she came
back to Chicago she has had pain nearly all the time
in her hip, one side, and her shoulder.   Four or five
years before the injury in question she had two at-
tacks of pneumonia and was treated by Dr. John
Davis.

On cross-examination, she testified that at a former
trial of her case, which was in progress about a week
before, Dr. Loeser was called as a witness; that she
does not know the name or whereabouts of the woman
who was with her the evening she was injured; that
she has never seen her since; that when she came back
to Chicago she made unsuccessful inquiries of a num-
ber of persons about her; that the woman did live in
a two-flat building between Clark and Halsted streets;
that she was never there more than twice; that she
originally met her at a restaurant where they took
supper; that she did not consider that she was ac-
quainted with her; that on the evening in question
they had dinner together, on Clark street, and then
went and boarded the car together; that the other
woman got off at Roscoe street, first, and at the rear
end of the car; that she followed her out; that she
saw the other woman on the sidewalk after the auto-
mobile backed up; that before that she (the witness)
screamed and that then quite a number of people came
out of the street car, some out on the platform, some
out on the ground; that she saw the other woman was

still standing on the sidewalk; that she does not remember that she came over to her or that she asked her to; that when the automobile struck her and pinned her against the street car she felt that she was being crushed and hurt; that it was a sort of numbness; that when the automobile backed away, she stood in the street with her feet on the ground and was so excited she did not feel any pain until five or ten minutes later when she began to walk; that she asked the boy at the wheel, who seemed about eighteen years of age, his name, but he did not answer; that there was a man at his side who was about forty or forty-five years of age, who is the defendant here. She further testified that she did not ask any one to assist her and did not take down any names or addresses; that all she did was to take down the number on the front of the automobile and ask the driver his name. The automobile, she says, struck her about three or four inches above the waist line; that she felt pressure on her right hip and left shoulder; that she thinks her right foot was on the ground and that her left hand had hold of the handlebar at the time; that she walked home alone, about five blocks south, as she was living at that time with Mrs. Ranier on Wellington street; that she felt pain, and with difficulty got up the stairs to her room and went to bed; that she called no one that night; that the pain in the hip made her know she was injured; that in the morning Mrs. Ranier came in to see what was the matter as she had not gone to breakfast; that she told her she had been hurt; that Mrs. Albrecht, to whom she thinks she asked Mrs. Ranier to telephone, came between 9 and 10 a. m. and came again in the afternoon; that she told her about her pain; that she was in bed all the time Mrs. Albrecht was there; that Mr. and Mrs. Kloess came in the evening; that she remained in bed all that day and night and took nothing to eat until evening; that Mrs. Kloess prepared a meal in Mrs. Ranier's kitchen and

brought it to her; that Mrs. Kloess sent for Dr. Ranes, a club friend of the plaintiff whom she knew well as a social worker for two or three years; that Dr. Ranes came that night, October 9; that no one else was present; that she stayed half an hour, but did not treat her professionally; that Dr. Loeser called on her the morning of the 10th and gave her a physical examination and told her she must go to a hospital, and then an ambulance was called and she was carried down stairs and taken to the American Hospital where she remained from October 10 to November 2, and was attended every day by Dr. Loeser; that X-rays were taken, and bandages put on the first morning; that she had pains in her hip, shoulder and back, also in her finger; that, prior to October 8, 1917, she had no pain in her hips or joints or any part of her body, and never suffered from nor was treated for rheumatism; that on the morning of October 9, 1917, she asked and Mrs. Ranier gave her some crutches.

On redirect examination she testified that Dr. Loeser told her she must rest and wear the belt on account of her hip being fractured; that, later, she went to the street car barns to try and find the conductor of the street car but was unsuccessful.

The evidence of Mrs. Albrecht, whose husband is a cousin of the plaintiff, is to the effect that prior to October 8, 1917, the plaintiff walked very quickly, did not move feebly; that she was called on the telephone by Mrs. Ranier the morning after the injury, and, about 9:30 that morning, called and saw the plaintiff, whom she found in bed, appearing to be in great pain; that Mrs. Ranier told her that the plaintiff had been struck by an automobile; that she was not asked to call a doctor and did not do so; that since the plaintiff came back to Chicago, she looked much thinner and moved about in a feeble way.

The evidence of the daughter of the plaintiff, Mrs. Ascough, is to the effect that shortly prior to the in-

jury in question her mother was in excellent health; that although she was a stout woman she was active and moved quickly; that she weighed about 165 pounds; that she saw her the second day after the accident at the American Hospital; that most of the time she was in the hospital she appeared to be in pain; that from the hospital she went with her to the home of Mrs. Kloess, where her mother stayed a week and was in bed most of the time; that then she moved only with the aid of crutches; that from there she was taken to the witness' home at Hartford, Connecticut; that she was taken from the taxi to the train in a wheel chair and at Hartford from the train to the automobile in a wheel chair and that at her home was carried up stairs to the third floor; that they put her to bed and she remained at her home five months; that during that time she appeared to be very feeble and was in bed most of the time and moved only with the aid of crutches; that a Dr. Axtell attended her four or five times; that the next time she saw her after she left her home was at Detroit in the early part of 1919; that her mother then moved about in a feeble, halting manner and used crutches when she walked; that her mother came from Detroit to Chicago in April, 1920; that she, the witness, came to Chicago in October, 1917, as the result of a telegram that her mother had been hurt by an automobile; that the telegram was signed by Mrs. Albrecht.

The witness, Edith Kloess, who had known the plaintiff for twenty-two years and, prior to October 8, 1917, saw her at least once a week, testified that she was always a very healthy and active woman up to the time she had the accident; that she was rather stout; that she, the witness, received a telegram from the plaintiff's daughter from Hartford, Connecticut; that she and her husband went that evening, the day after the accident, and saw the plaintiff in bed; that she appeared to be suffering; that she and her hus-

band remained there until 10 or 11 o'clock that night; that the first thing she did was to get the plaintiff something to eat in the kitchen in the apartment where she was rooming; that the next morning she saw the plaintiff at the hospital and thereafter almost every day, that after the plaintiff left the hospital she went to the home of the witness where she, then, was in bed practically all the time.   On cross-examination she testified that her husband called Dr. Loeser the evening after the injury and made the arrangement that the doctor was to see about the hospital the next morning; that she and the witness had been very close friends for many years.

Another witness, Mrs. Ellen Keeler, testified that she had known the plaintiff for seven years and saw her several times a week prior to October 8, 1917, and that she was robust and healthy looking.

It is the evidence of one A. F. Kloess, a clothing manufacturer, that he and his wife were out of town at the time of the accident and when they got home they found a telegram requesting them to go to the home of the plaintiff; that he and his wife accordingly on the evening of October 9, 1917, visited the plaintiff, who was in bed, and while there his wife prepared, in Mrs. Ranier's kitchen, something to eat for the plaintiff.

On behalf of the defendant, Mrs. Ranier, at whose house the plaintiff lived in October, 1917, was called. She testified that her invalid husband, her son, a roomer and the plaintiff lived on October 8, 1917, at 847 Wellington avenue; that she had known the plaintiff about six years; that on the day in question she and the plaintiff had agreed to go to a "movie" and were to meet at Belmont avenue and Clark street; that they met and the plaintiff told her that she had just been hurt by an automobile; that they walked to the "movie" and stayed about an hour and then walked home; that the plaintiff complained that she

felt badly; that they walked slowly; that she took hold of plaintiff's arm; that the plaintiff seemed to have difficulty getting up stairs and said she felt badly; that plaintiff went to bed and she did not see her again until between 6 and .6:30 the next evening; that the plaintiff was out of her room during all that day; that she hád her (the witness) telephone for Mrs. Dr. Ranes; that Dr. Ranes and her husband (attorney for plaintiff) came that evening and saw the plaintiff; that on the second day Mrs. Albrecht and Dr. Loeser called; that the plaintiff went to the hospital on October 11; that the evening after the injury plaintiff, when she came back, borrowed some crutches of her; that plaintiff while living with her had complained that she had a stiff index finger. On cross-examination she stated that the plaintiff is a good friend of hers, and is a good, honest woman.

The defendant, Nathan N. Klawans, testified that in October, 1917, he lived at 619 Gary Place, about four blocks north of Roscoe and Broadway; that he owned an automobile which he drove very seldom but had driven a few times; that his son was usually in the car with him and did the driving; that he did "customarily pass by the intersection of Roscoe and Broadway at that time"; that on October 8, 1917, he was not in an automobile at Roscoe and Broadway and did not run into the plaintiff with an automobile at that time or any other time; that the first time he ever saw the plaintiff was the week before the present trial; that he never rode with his son or with anyone else at the steering wheel when the plaintiff asked the driver for his address; that his automobile was a Kisselkar and had fenders over the front wheels; that the first he heard of the plaintiff's claim was about two or three months after October 8, 1917, when he received a telephone call from someone who said he was an attorney and who said that his, the witness', car had struck and hurt a woman; that the one calling

said the reason he did not telephone before was that he had been out of town; that at that time he, the witness, had no means of "checking back and positively telling" what he was doing on the evening of October 8, 1917.    On cross-examination he said that he was in the wholesale liquor business and had been for thirty-six years; that when driving he frequently passed Roscoe and Broadway.

The evidence of Lester H. Klawans, the son of the defendant, and who was in business, and lived with his father, is to the effect that he did not on October 8, 1917, have an accident at the corner of Roscoe street and Broadway by which he ran into a woman getting off a Broadway street car which was standing still, headed north; that he never injured anyone or ran into anyone at that point on October 8, 1917, or at any time; that he was never at that point, in an automobile at the steering wheel with his father sitting with him when some woman asked him for his address.

Two doctors, Ricardo and LaForge, who examined the plaintiff on her behalf a short time before the trial, were put on the stand by the plaintiff.    Ricardo stated that he found a fracture of the second phalanx of the index finger of the left hand, a slight limitation of motion of the left shoulder joint, an elevation over the sixth and seventh ribs about two and one-half inches from the spinal column in the back on the right side, a limitation of motion in the right hip joint, and a subluxation or displacement of the third lumbar vertebra. The court struck out, and directed the jury accordingly, all his evidence as to immobility of the shoulder, the leg or the hip and as to any fracture.    Laforge stated that he found a swelling of the index finger of the right hand (at one place he says the left), which often arises from arthritis; a twisting of the fifth, sixth and seventh ribs about four and a half inches from the spinal column, and that certain vertebræ were out of alignment.    He, also, stated that in 90 per cent

of such cases, as to the condition of the ribs, the cause is violence. The record is somewhat confusing as to just what portions of the testimony of LaForge were finally left in.

The defendant called two doctors, Davis and Small. The evidence of Small is that he treated the plaintiff in April, May and July of 1913, at her home, for rheumatism, which he says she had in the left shoulder and arm and down in the lumbar region; that subsequently he treated her for pneumonia.

Dr. Small, called by the defendant, testified in answer to a hypothetical question which contained the history of the circumstances surrounding the collision and the history of the condition of the plaintiff from the time of the injury practically down to the time of the trial, that the condition of the plaintiff such as the subluxation of the third lumbar vertebra and the prominence of the ribs could not come from the collision; that the condition could be accounted for as the result of the rheumatism and pneumonia; that it would take a severe blow to produce subluxation of the third lumbar vertebra; that in his opinion a person suffering from a blow of sufficient extent to cause the conditions mentioned could not have walked five blocks to her home and gone up three flights of stairs. He further testified in answer to another hypothetical question involving conditions such as were testified to by Drs. Ricardo and LaForge, that the injuries described would not come from an accident but from rheumatism and pneumonia. On cross-examination he testified that one who had rheumatism might get hurt more than a normal individual; that it might be possible to aggravate it.

Evidence of the automobile records in the Protective Bureau of the City of Chicago was introduced showing that the automobile bearing license number 207771 was a Kisselkar and stood in the name of Nathan N. Klawans, 1347 N. LaSalle street. There was offered

in evidence section 2484 (a) of the ordinances of the City of Chicago which is as follows:

"It shall be unlawful for any person driving or having charge, possession or control of any vehicle being driven or propelled or operated upon the streets of the City of Chicago upon overtaking any street car which is stopped for the purpose of discharging or taking on a passenger or passengers to permit or cause said vehicle to pass or approach within ten (10) feet of said car as long as the said car is so stopped or remains standing for the purpose of discharging or taking on a passenger or passengers."

At the close of all the evidence and the arguments of counsel, eight instructions were given on behalf of the plaintiff and eighteen on behalf of the defendant. The jury brought in a verdict in the sum of $5,000 in favor of the plaintiff and against the defendant and, judgment being entered thereon, this appeal is therefrom.

We have had grave difficulty in reaching a conclusion in this case. At first blush, it seems harsh to allow a plaintiff to recover for a collision and consequent injury, when the defendant, corroborated by his son, denies that he took any part and states that neither he nor his machine was there. On the other hand, it is the law that if a plaintiff by her testimony makes out a prima facie case, that is, recites facts that in and of themselves constitute all the essential elements of a cause of action, and a jury believes them to be true, there may be a recovery and judgment, and, in such a case, unless we are of the opinion that it is against the manifest weight of the evidence, it must stand.

Practically considered, the evidence of the plaintiff, that, on the evening of October 8, 1917, while alighting from a northbound street car which had stopped to let off passengers at Broadway and Roscoe streets, she was run into by an automobile bearing the number

207771, which was the number of an automobile owned by the defendant, is not denied.

The question arises, are there such discrepancies, contradictions and suspicious circumstances in and about her testimony, considering all the evidence in the case, so striking as to lead the mind, reasonably, to doubt the truth of her story; so strong, in fact, as to impel us to the conclusion that to hold the defendant liable would be clearly against the weight of the evidence?

There is a direct contradiction by Mrs. Ranier of some of the testimony of the plaintiff. Mrs. Ranier says she and the plaintiff had agreed to meet at Belmont avenue and Clark street to go to a "movie" and that they did so meet and go. That is denied by the plaintiff. Mrs. Ranier, however, does say that the plaintiff when they met, told her she had just been hurt by an automobile, and complained, and walked slowly. Also, Mrs. Ranier says the plaintiff was not in her room the next day until 6:30 in the evening, and that she went to the hospital on October 11. On the other hand, certain testimony of Mrs. Ranier is contradicted by four witnesses. She was contradicted, not only by the plaintiff, but by Mrs. Albrecht, Mrs. Ascough and Mr. Kloess. Mrs. Albrecht stated that Mrs. Ranier called her up about 9:30 in the morning after the injury and that she went to her home and found the plaintiff in bed in great pain, and that on that occasion Mrs. Ranier told her that the plaintiff had been struck by an automobile. Mrs. Ascough and others testified that the plaintiff was taken to the American Hospital on October 10. Edith Kloess stated that she got the plaintiff something to eat in Mrs. Ranier's kitchen, which contradicts the testimony of Mrs. Ranier. Further, the testimony of Edith Kloess is corroborated by the direct testimony of her husband, A. F. Kloess.

On the whole it seems quite obvious that the jury

would be justified in considering the testimony of Mrs. Ranier as quite untrustworthy; and that, of itself, leaves the testimony of the plaintiff free from any suspicion or doubt that, otherwise, might arise, were the testimony of Mrs. Ranier worthy of belief.

Some argument is made concerning the fact that it is strange that the plaintiff's acquaintance, who, she says, was with her and got off the street car ahead of her and went over on to the sidewalk, did not stop and give the plaintiff any help. The evidence of the plaintiff as to that is that she did not know the woman's name and had met her only in the most casual way; that "she took her dinner at Clark street, the same as I do"; that she did not know her name or where she lived; that after she, the plaintiff, came back to Chicago she made inquiries in the neighborhood but was unable to find her.

There remain, then, to be considered, in determining liability, two questions of fact; (1) Did the evidence justify the jury in concluding that the automobile which struck the plaintiff was operated on behalf of the defendant? (2) What was the extent, if any, of the plaintiff's injuries?

As to the identification of the automobile which, according to her testimony bore the number 207771, and which the official records showed belonged to a Nathan N. Klawans, and which was the one which struck her on the night in question: Both the defendant and his son testified, substantially, that it was not the Kisselkar owned by the defendant. The father said he owned an automobile, a Kisselkar, and that it was usually driven by his son, and that it was his custom about the time in question to pass through the intersection of Broadway and Roscoe street. The son denies having had any accident at the corner of Broadway and Roscoe street when a woman getting off a Broadway street car was injured. And, he says further, that no woman ever asked him, while he was in

an automobile at that point, and his father was sitting by him, for his address. The facts presented to the jury—on the question of identification—were made up of the following: The statement of the plaintiff that the number of the automobile was 207771; that she saw that number on the automobile that injured her, and wrote it down in her note book; that that number according to the official records was the number at that time on a Kisselkar belonging to the defendant; that she spoke to the driver, a boy about eighteen years of age; that there was a man at his side who was about forty or forty-five years of age; that in July, 1920, she saw the defendant come out of his house on Gary Place where she had gone to see if she could identify him as the man she saw in the automobile; that she then recognized him as the defendant, Klawans; and, further, the statement of father and son admitting the ownership of a Kisselkar at that time, and, perhaps by inference, bearing the number in question, but a denial—though not quite categorical by the son—that either of them was there at Roscoe street and Broadway with that or any automobile on the evening in question.

No evidence was introduced to show the whereabouts of the defendant or his son on the night in question. That, however, is of no special import as the evidence of the defendant is that he knew nothing of the plaintiff's claim for some time afterwards.

From what has been stated, it is quite obvious that there was presented to the minds of the jurors a situation of fact concerning which they would be necessarily bound to draw inferences depending almost entirely upon the credibility attributed by them to the witnesses themselves. If they felt bound, as a matter of reason, to believe the story of the plaintiff and that she was telling the truth and at the same time felt convinced that the statements of the defendant and his son were doubtful, their conclusion as to the defend-

ant's liability was a reasonable one, and their verdict, if not excessive as to amount, we feel must be considered as binding on us.

It is contended by the defendant that the evidence does not show that the plaintiff exercised ordinary care. It is argued that "there is no evidence that the plaintiff at any time looked for the purpose of ascertaining whether any vehicle in the street might endanger her safety on alighting, no evidence that she used her faculties." The question of her care was a matter for the jury, and her evidence, which is undisputed, is that the street car stopped at the proper place and that, while facing north, she took hold of the bar with her left hand, and, while alighting, was struck. It does not seem reasonable to hold that to exercise ordinary care she ought to have looked to the south. The ordinance was in force and she was entitled to assume, not being aroused or alarmed by anything suggesting danger, such as a gong or a horn or a cry, that it was safe for her to alight. We think that we are not entitled to consider that the jury erred in concluding, as they must have done, that she was in the exercise of ordinary care.

It is contended that the defendant was not guilty of negligence inasmuch as there was no evidence that the automobile was operated at an excessive speed, and that there was no evidence as to the distance the automobile was from the plaintiff when she reached the ground. It is argued that as there was nobody alighting immediately ahead of the plaintiff, and that the evidence shows that one who had alighted had reached the sidewalk, ten feet away, it was not a violation of the ordinance in question to attempt, under the circumstances, to pass the standing car. Inasmuch as the car was standing still in the proper place, near the intersection, and the plaintiff, according to the evidence, was undertaking to alight therefrom, not only do we think the contention of counsel untenable, but

that the conduct of the defendant was even in the nature of an obviously wilful violation thereof.

It is contended that the trial judge erred in regard to the admissibility of certain evidence. It is urged that all the testimony of the Doctors Ricardo and LaForge as to what they found on their examinations of the plaintiff, made over three years after the accident, should have been stricken out as it "was in no way shown to have been connected with the accident." Dr. LaForge was asked, "What are some of the things that would cause the condition that you found, or might cause the conditions that you found?" To which he answered that there were many things that could produce it, but it was usually caused by a blow or fall or an accident of some kind. Dr. LaForge when asked what might cause the condition of the ribs that he found said that 99 per cent of such cases were due to violence. The substance of the testimony of both Doctors Ricardo and LaForge as to what they found as the result of an examination for the purpose of testifying was based, substantially, on objective symptoms and was therefore competent.

Counsel for the defendant claim that although the trial judge struck out and told the jury to disregard the answer of the plaintiff that Dr. Loeser told her she must rest and wear a belt on account of her hip being fractured, it still must be considered as sufficiently harmful to the defendant's cause as to constitute ground for reversal. The record shows that the attention of the court, on some day later in the trial than when the testimony was given, was called especially to the motion of the defendant that it be stricken and the jury instructed to disregard it, and that that motion was allowed and that the trial judge then instructed the jury to disregard that testimony. Under the circumstances we think that was sufficient to cure the error.

As to the instructions: It is claimed for the defend-

ant that instruction numbered eight was erroneous. That instruction recites certain necessities such as, attempting to pass while the car was stopped, approaching within ten feet of the car in violation of the ordinance, the exercise of ordinary care on the part of the plaintiff, violation of the ordinance being a proximate cause of the injury, and then ends, "provided you further find from a preponderance of the evidence and under the instructions of the court that the plaintiff is otherwise entitled to recover." This instruction does not say that if the jury find that the violation of the ordinance proximately caused the injury, the verdict should be for the plaintiff. It differs materially from *Culver v. Harris,* 211 Ill. App. 474. Many necessary elements are mentioned and then occurs the requirement "otherwise entitled to recover." It was an instruction of little if any value for the plaintiff, and certainly could do no harm to the defendant. Further, as the defendant offered no evidence whatever to account for the automobile approaching within ten feet of the street car while it was stopped, and passengers were alighting, a prima facie case of negligence on the part of the defendant was sufficient. There is not a scintilla of evidence, assuming the plaintiff's testimony to be true, that the ordinance was not violated. At the trial it was not controverted.

It is claimed that instruction numbered five was erroneous. Counsel argue that "the instruction takes from the jury the question whether plaintiff exercised care in going into such a situation." We do not think that contention tenable. The car was standing still in order that she might alight. The automobile came from the rear. She had one foot on the ground when it collided with her. These facts are not disputed. In that situation, it was proper to instruct the jury that ordinary care "is that degree of care and caution which a reasonably prudent and cautious person would

have exercised under the same or like circumstances, and in the situation in which the plaintiff was placed, as shown by the evidence.'' No question of contributory negligence arises here, as in *North Chicago St. R. Co. v. Cossar,* 203 Ill. 608. Further, the instruction here, tells the jury that the plaintiff was ''required to use ordinary care just before and at the time of the accident in question.''

It is claimed that instruction numbered seven is erroneous. The prefatory paragraph of that instruction cures the part which counsel for the defendant criticises. The jury are told to determine the amount of plaintiff's damages, if any, so far as such damages as are alleged in her declaration are established by a preponderance of the evidence. *Miller v. Kelly Coal Co.,* 239 Ill. 626. We do not feel that it would be reasonable to consider the one or two more or less immaterial elements mentioned in the instruction, about which there was little or no evidence, as sufficient to justify a reversal of the judgment.

There is some contention that the argument of counsel for the plaintiff was improper and is alone sufficient ground for reversal. It is true that there is some ground for criticism but we do not feel that the impropriety was such as to justify a reversal.

It is claimed that the verdict is excessive. There is no doubt but that the burden of proof was upon the plaintiff to show that the injuries she complained about were the proximate result of the collision (*Neville v. City of Chicago,* 201 Ill. App. 562) and, also, must prove by a preponderance of the evidence, what the injuries were (*Kimbrough v. Chicago City Ry. Co.,* 272 Ill. 71). Believing, as we do, that the jury were sufficiently justified in concluding that the plaintiff was struck and injured by the defendant's automobile, it follows, as stated in the *Kimbrough* case, *supra,* that ''a physician may then directly testify that a later malady was or was not caused by the accident

or original injury, upon the same principle that he may testify that death resulted from a certain wound.''

The evidence of the witness, Dr. Davis, is to the effect that he attended the plaintiff some seven or eight years before the trial for rheumatism and lumbago; that he treated her five times in the summer of 1913. The evidence of the plaintiff is that she was entirely recovered prior to the time of the collision and it is her evidence and that of Mrs. Albrecht, Mrs. Ascough, Edith Kloess and Ellen Keeler; that at the time of the collision she was in good health. The evidence of the witness, Dr. Small, called by the defendant, who was given a hypothetical question covering very elaborately the history of the occurrence and the life of the defendant prior to and subsequent to the time of the collision, is that a subluxation of the third lumbar vertebra and the prominence of the ribs could not come from the collision; that the conditions described in the question involving rheumatism and pneumonia would account for the displacement of the vertebra or the deformed ribs; that it would take a very severe blow which would leave marks and contusions upon the body to produce a displacement of the third lumbar vertebra, and that under such circumstances the person struck could not walk five blocks and go up three flights of stairs. He further stated that a swollen finger, the twisting of the fifth, sixth and seventh ribs, a displacement of certain vertebræ, would not come from the collision but could be caused by rheumatism and pneumonia. Also, that subluxation when due to injury occurs suddenly and comes at the time of the injury. Further, on cross-examination, he stated that a person who has rheumatism may get hurt more than a normal individual, depending upon how much rheumatism he has when hurt, and that a joint could be made most intensely painful by being hurt.

The evidence of Dr. LaForge, who examined the plaintiff, is to the effect that in regard to displacement

of the ribs, 99 per cent of them are due to violence, and that the number of things that might displace a vertebra are innumerable, the common cause being a blow or an accident of some kind.

The evidence of Dr. Ricardo, who examined the plaintiff shortly before the trial, was that he found a fracture of the second phalanx of the index finger of the left hand, an elevation of the sixth and seventh ribs and a displacement of the third lumbar vertebra. When asked the cause of those conditions he stated that it was violence.

From the foregoing it is obvious that there was a controversy as to the nature of her injuries, and what part, if any, of them was caused by the collision. It may be that all the plaintiff complains of was the result of the pneumonia or rheumatism or both that she may have suffered from in 1913. There is ample evidence, however, that immediately subsequent to the collision she was in pain and changed from a condition of seeming good health to that of a *quasi* invalid. In *Chicago City Ry. Co. v. Bundy*, 210 Ill. 39, the court said: "We have held, whether a person was sick or not is a fact requiring no special skill or science to understand, and that the fact may be proved by anyone who knows it." Four witnesses, beside the plaintiff, testified that on October 8, 1917, she was in good health.

After carefully considering all the evidence, and there is considerable, bearing upon her injuries, we do not feel justified in concluding that the jury erred in deciding that she was seriously hurt by the collision, nor do we feel, under the circumstances, that the damages allowed are excessive.

The judgment will, therefore, be affirmed.

*Affirmed.*

O'Connor, J., concurs.

Mr. Presiding Justice Thomson, dissenting: I feel obliged to dissent from the foregoing decision. The

only evidence to the effect that the plaintiff was struck by an automobile or that the automobile involved was the defendant's is based on the testimony of the plaintiff alone. There is some testimony by one or two other witnesses to the effect that the plaintiff told them she had been hit by a machine. The defendant and his son both denied having experienced any such occurrence as the plaintiff described at the time she says she received her injuries. Of course, on that state of the record, it would not necessarily follow that the plaintiff had failed to make out her case by a preponderance of the evidence, and if the jury believed the plaintiff and did not believe the defendant and his son, and returned a verdict in her favor, it ought not to be set aside in the absence of other facts and circumstances appearing in the case sufficient to warrant this court in saying that the verdict is against the manifest weight of the evidence. In my opinion there are such other facts and circumstances in the evidence in this record.

Among the strange and inconsistent circumstances shown in the evidence, which materially weaken the plaintiff's case, are the following: According to the plaintiff's testimony she and the woman, whose acquaintance she had made at the restaurant where they were in the habit of taking their meals, were together at the time of the occurrence in question. They had left the restaurant that evening together, taken the car up to Roscoe street, and, apparently, from the plaintiff's testimony, this woman friend of hers got off the car first and stepped over to the sidewalk about ten feet away and was standing there at the time the plaintiff received her injuries. The plaintiff says that at the time she was injured she screamed and a number of passengers came out of the car to see what the trouble was. Of course, the conductor was right there also. With all of these witnesses to the alleged occurrence, not one of them was called as a witness on this

trial to corroborate the plaintiff's testimony. The plaintiff testified that she had recently made some effort to find the woman who was with her that evening but had failed. She also testified that she did not know the woman's name, although she admitted that she did know it at the time of the accident. She also says in her testimony that one of the passengers who came out of the car, a man, offered to give her his name, but, for some reason, she did not take it.

Occurrences of this kind sometimes happen under such circumstances as would easily account for the absence of corroborating witnesses, but it does not seem to me that this is that kind of a case. The plaintiff does not claim she lost consciousness. She apparently, according to her own story, did not even lose her presence of mind, for she testified that as soon as the automobile backed away from her she turned around, took a note book out of her purse, and put down the license number of the automobile and furthermore stepped up to the young man at the wheel and tried to get his name, which she says he declined to give her. If the plaintiff had sufficient presence of mind to appreciate the desirability of noting the number of the automobile and asking the man at the wheel his name, it seems inexplicable that she should not ask her friend where she could be reached or take the names of one or two of those who came out of the car to see what had happened, at least the name of the man who, she says, offered to give his name.

This is not a case where the plaintiff felt at first that she might not be injured very much and did not discover until some time later that she was. Plaintiff says she got home with difficulty, but went right to bed and within twenty-four hours after the occurrence, she testifies, she was in the hospital. Nor is this a case where the plaintiff was without legal advice until some time after the incident involved is alleged to have occurred. The evidence shows that the lawyer who

represented her in the trial of this case visited her at her room on the evening after she says she was struck by the automobile bearing the number noted by her at the time. It might be reasonably argued that the plaintiff herself, although appreciating the need of the number of the automobile, might not appreciate the desirability of some corroborating witnesses, but of course her lawyer would not overlook any corroborating witnesses that were available. If this incident occurred as the plaintiff described it and under all the circumstances involved in her testimony, it was a very simple matter at the time her lawyer came into the case to locate the woman who was with her at the time, who frequently visited the restaurant where they had been taking their meals and where the plaintiff says their acquaintance was made, and it would have been equally easy to have located the conductor. But neither of these persons appeared in the case and so far as the evidence discloses there was no effort made to reach them until three or four years after the plaintiff says she was injured. It further appears affirmatively that no report of this accident was made by any street car employee to the company.

Another queer circumstance about this case is that the defendant was not notified that he was being held responsible for injuries received by a woman who claimed she had been struck by his automobile until some two months after it is claimed the injuries were received, at which time, of course, the defendant was not in a position to remember where he was at the time of the alleged occurrence, let alone prove it. According to the testimony of the plaintiff, she never saw the defendant from the time of the accident until nearly three years later, when she says she was able to identify him clearly, although she testified that she had only a hazy picture of the young man at the wheel and was not particularly impressed with him.

Not only did the plaintiff fail to produce any wit-

nesses corroborating her description of the occurrence, but she failed to produce her own attending physician. Her counsel made a motion that this witness be called as a court's witness alleging that he had made statements out of court which were inconsistent with statements that he had made in court. There was no showing made as a basis for that motion, the doctor was not present in court, so far as the record shows, and the court properly overruled it. About a week previous to the trial of this case, it appears from the record that it had been tried partially and at that time the plaintiff's doctor was in court and testified. His absence here, in my judgment, is not satisfactorily explained. It further appears from the testimony of the plaintiff that there was a second doctor who examined her while she was in the hospital, who had also examined her during the month preceding the trial, at which time, the plaintiff says, he made a thorough examination of her, but the testimony of this doctor also is conspicuous by its absence. This doctor was in court but was not called as a witness by the plaintiff. He was called to the stand by the defendant and asked a few questions, apparently for the purpose of showing he was available as a witness. He seemed very anxious not to testify and stated he would decline to answer questions. It seems quite odd that the plaintiff should have two attending physicians, neither of whom should be in a position to give testimony which might be considered satisfactory by her, if she has a bona fide case.

The plaintiff was flatly contradicted by the woman in whose household she made her home, in many respects, but this witness in turn was contradicted by four or five others, friends of the plaintiff, and, so far as the testimony of this witness is concerned, it would not justify disturbing the verdict. But when all the peculiar and inconsistent circumstances involved in this case are taken into consideration in connection

with the fact that this is a "blind" case, involving an alleged accident supported by the testimony of the plaintiff alone, and which the defendant and his son testify never happened, they seem to me to be so strong as to require this court to set aside the verdict and the judgment, and in my opinion that should be the decision here.